UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

99 SEP 30 PM 2: 17

U.S. DISTRICT COURT
N.D. OF ALABAMA

CHESTINE LEE RAINES,           )
                               )
        Plaintiff,             )
                               )
vs.                            )       Civil Action No. CV-96-S-2887-NE
                               )
RON JONES, Former Commissioner )
of the Alabama Department of   )
Corrections; and CORRECTIONAL  )       ENTERED
MEDICAL SERVICES,              )
                               )       SEP 30 1999
        Defendants.            )

## MEMORANDUM OPINION

This action is before the court following a nonjury trial
conducted in Birmingham, Alabama, on September 20 and 21, 1999.
Plaintiff contends defendants violated his rights under the Eighth
Amendment by being deliberately indifferent to his serious medical
needs. He sues under 42 U.S.C. § 1983, and requests $50,000 in
compensatory damages, $100,000 in punitive damages, and corrective
surgery on his injured finger. Upon full consideration of the
pleadings, testimony, and exhibits, the court finds in favor of
defendants.

Plaintiff failed to prove that physicians, nurses, and other
medical personnel employed by Correctional Medical Services were
deliberately indifferent in treating his broken finger. At best,

1

the evidence demonstrated these individuals were negligent, in the sense that they should have perceived the risk inherent in the delay between plaintiff's injury and treatment, but they did not. *See Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999). Under Supreme Court precedent, a plaintiff must prove more than negligence to establish an Eighth Amendment violation.

The defendants sued in this action would not have been liable to plaintiff in any event, even if the evidence showed that the medical personnel who treated him were deliberately indifferent. The evidence failed to reveal that any established policy or custom of Correctional Medical Services or the Alabama Department of Corrections caused the injuries forming the basis of plaintiff's complaint.  Further, no evidence indicated that Ron Jones, individually, was responsible for plaintiff's injuries.

## I. FINDINGS OF FACT

### A.  Correctional Medical Services Contract with the Alabama Department of Corrections

Correctional Medical Services ("CMS") is a private company that provides health care services to inmates housed in correctional facilities of the State of Alabama, including specifically convicts at the St. Clair Correctional Facility ("St. Clair") in Springville, Alabama.  CMS has its own space within St.

2

Clair to operate an infirmary. While Alabama Department of Corrections ("ADOC") employees spend time in the infirmary at St. Clair, CMS is responsible for the hiring of nurses, physicians, and ancillary health care providers ("CMS personnel"), such as x-ray technicians.[1] CMS independently contracts with these individuals to provide care at St. Clair.

During all dates relevant to this lawsuit, two physicians who contracted with CMS routinely spent time at St. Clair. Dr. William Hammack was the medical director at St. Clair. He normally spent thirty to forty hours per week there and remained on call at other times. Dr. John Tingley, a urologist, spent eight hours at St. Clair on Thursdays. The state-wide medical director of CMS, Dr. George Lyrene, was available for consultation during times when either Dr. Hammack or Dr. Tingley was not available. Also, the x-ray technician with whom CMS contracted, Sherri Crunk, was not at St. Clair on a continuous basis. Rather, she spent certain established hours[2] at the facility and was available on an "on call" basis otherwise.

---

[1] Although the warden at St. Clair conducts weekly meetings that involve CMS personnel, this court finds that no ADOC employee directly provides medical care at St. Clair.

[2] According to the testimony of Larry Linton, a regional manager for CMS, Crunk was present at St. Clair during normal business hours.

3

**B. CMS Policies and Procedures**

CMS issued policies pertaining to "Emergency Services" as part of its "Health Services Policy & Procedures Manual." These policies provide, in relevant part:

    1.  Twenty-four (24) hour emergency medical, mental health and dental care will be available to all inmates.

    2.  Agreements will be made with local Emergency Rooms to provide emergency/off-site care for inmates.

    . . .

    5.  A physician will be available for consultation 24 hours per day, 7 days per week.

    6.  "On-call" schedules will be developed and the pager or telephone numbers will be listed on the schedule and posted in the Health Services Unit.

    8.  Correctional and healthcare staff will be trained in proper emergency transfer procedures in order to facilitate the immediate transfer of inmates.

(Plaintiff's Exhibit 1.) An "emergency" situation concerns a life-threatening or limb-threatening condition. Put another way, "emergency care" encompasses medical treatment that could not be delayed until a physician's next scheduled visit to St. Clair.

CMS also issued policies and procedures pertaining to "Daily Handling of Non-Emergency Medical Requests" as part of its "Health Services Policy & Procedures Manual." Those policies provide:

    1.  Inmates of the institution will have access to non-emergency healthcare by submitting a written

4

request that is triaged by a qualified healthcare
staff member on a daily basis.

2.  A designated healthcare staff member will make
    rounds in segregation areas daily to solicit
    healthcare requests from segregated inmates.

Within this same title, the procedures provide, in relevant part:

1.  An approved Health Services Request Form will be
    provided in each housing unit.

. . .

4.  Triage decision, or inmate assessment, will be
    documented on Health Services Request Form or
    Medical Record.

5.  Any inmate with a request suggesting the problem
    may be of emergent nature, (ie. [sic], chest pain)
    will receive prompt attention.

6.  Non-emergency requests will be scheduled for
    appropriate level sick call.

(Defendant CMS' Exhibit 2.) A "triage decision" is a subjective

assessment made by CMS personnel, usually a nurse, of the severity

of an inmate's medical condition. It is based on the description

provided by the inmate in his Health Service Request Form. As part

of the triage decision, a nurse decides whether a complaint should

be classified as "emergency" or "non-emergency," and so notes on

the form itself or the inmate's medical record. Classification as

an "emergency" situation may occur after a direct examination by

the nurse or a telephone conversation with the physician, in which

5

the nurse verbally describes his or her observations of the inmate's condition and symptoms. When "on call," CMS physicians rely solely on the nurse's evaluation in making their decisions. The court assumes, in the absence of evidence clearly dictating a finding, that classification of an inmate's medical condition as an "emergency" or "non-emergency" triggers adherence to one or the other of the policies and procedures set forth above.

## C.  Raines' Finger Injury and Dealings with CMS Personnel

Plaintiff, Chestine Lee Raines, is a fifty-year old inmate of the State of Alabama. He is currently incarcerated at St. Clair. He was incarcerated at St. Clair for all times relevant to this lawsuit.

### 1.  Pre-Surgery Facts

On either December 18 or 19, 1995, Raines injured the small finger on his left hand by slipping in the shower. He testified he fell trying to break up an altercation between two other inmates. Raines stated he jammed his finger into that area of the shower where the wall meets the floor.

On December 20th, Raines filled out a Health Services Request Form, writing that he "fell in shower and hurt hand." (Defendant CMS' Exhibit 8.) At approximately 8:00 a.m. the following day, December 21st, Raines was examined by Greg Cushin, a licensed

6

practical nurse ("LPN") employed by CMS.  Cushin recorded the
following observations on Raines' treatment record, referred to
throughout the trial as a "Body Chart":

> Little finger [with] edema[3] noted, (mild) / entire finger
> except for tip.  Ecchymotic,[4] redness noted.  NAD [No
> Acute Distress] noted, [without] physical expression of
> discomfort.
> Pain = throbbing, aching / middle knuckle, No abrasion,
> skin intact, poor ROM [Range of Motion] / middle Knuckle.

(Plaintiff's Exhibit 5.)   Based on his physical examination of
Raines' finger, Cushin recorded the following treatment decisions:
"[S]plint finger for Now.   Let Dr. [doctor] Eval. [evaluate]."
(Id.)   In addition to application of a splint, Cushin provided
Raines with Motrin for inflammation and APAP (aspirin) for pain.[5]
(See id.)   Two other features of the Body Chart are relevant to
this action.   First, Cushin had the option of assessing Raines'
condition as either "Emergency" or "Other."   Cushin indicated
Raines' condition fell under the category of "Other," which shall
be deemed "Non-emergency" for purposes of this opinion.   (See id.)

---

[3] *Dorland's Illustrated Medical Dictionary* (28th ed. 1994) defines edema,
in part, as "the presence of abnormally large amounts of fluid in the
intercellular tissue spaces of the body ...."  *Id.* at 528.

[4] *Dorland's* defines ecchymotic as "pertaining to or of the nature of an
ecchymosis."  *Id.* at 524.  Ecchymosis pertains to "a small hemorrhagic spot ...
in the skin or mucous membrane forming a nonelevated, rounded or irregular, blue
or purplish patch."  *Id.*

[5] Despite the testimony of Dr. Hammack, the court finds no documented
evidence that a conversation occurred between Cushin and Hammack on December 21,
1995.  Further, there is no record of x-rays taken on December 21st.

7

Also, Cushin marked through the following conditions on Raines'
Body Chart: "Abrasion, Burn, Laceration/Sutures." This redaction
indicates Raines' condition did not involve one of these problems.
Cushin did not mark through the following conditions: "Contusion,
Fracture." This lack of redaction indicates his condition
potentially did involve one of these problems. (See id.)

Finally, Raines testified that Cushin ordered him to soak his
hand in hot water and squeeze a ball constructed from gauze and an
ace bandage. He recalled Cushin said a doctor would see him after
the Christmas holidays. Despite continued complaints by Raines,[6]
he received no further examination or treatment from CMS personnel
between December 21st and December 27th, even though an expense
report indicated Dr. Hammack was at St. Clair on December 21 and
22, 1995. (Plaintiff's Exhibit 14.)

On December 26th, Raines filled out another Health Services
Request Form, writing he "[p]robably broke finger." (Plaintiff's
Exhibit 7.) Upon receipt of this form and following examination,
another LPN employed by CMS, Stanley A. Smith, recorded that Raines
should "[s]ee MD, today - 12/27/95." (Id.)

---

[6] Raines testified he continued to complain to CMS personnel every time he
went to pick up medication for his finger. Linton testified that the proper
procedure for Raines to follow between December 21st and December 27th involved
filling out another Health Services Request Form or contacting ADOC security
directly, to let them know the pain in his finger had increased.

8

On the following day, December 27th, Raines was examined by

Dr. Hammack and an x-ray was taken of his finger. The radiology

report summarized the results:

> Left 5th finger: There is a comminuted fracture
> involving the base of the middle phalanx of the left 5th
> finger. There is separation of fragments and moderate
> deformity at the fracture site. There is disruption of
> the articular surface at the base of the middle phalanx.
> IMPRESSION:    THERE IS A COMMINUTED INTRA-ARTICULAR
> FRACTURE INVOLVING THE BASE OF THE MIDDLE PHALANX OF THE
> LEFT 5TH FINGER.

(Defendant CMS' Exhibit 5.) Dr. Lyrene[7] recommended a consult with

a private physician based on these results. Plaintiff was examined

by an orthopedic surgeon, Dr. James St. Louis, on December 28th in

Cullman, Alabama. (See id.) Dr. St. Louis determined that a

surgical procedure known as an open reduction internal fixation

should be performed the following day. His written assessment of

the examination noted that Raines' condition involved "significant

joint deformity and significant contracture[,] probably secondary

to delay in treatment." (Plaintiff's Exhibit 4.) Dr. St. Louis

elaborated on the significance of the delay from the time of

Raines' injury (on or about December 18, 1995) to his surgery (on

December 28, 1995) in his deposition:

     Q.   The injury occurs on the night of the 20th. He's

---

[7] Dr. Hammack claimed Raines was seen by both himself and Dr. Lyrene around
December 27th.

9

seen in the infirmary on the 21st. He's given Motrin for
the inflammation. He's given aspirin for the pain. And
the nurse indicates on her report -- just assume that she
indicates splint finger for now; let doctor evaluate.
That's on the 21st. And then I want you to assume that
on the 27th he is evaluated by a doctor.

A.    Yes.

Q.    And this is the first time x-rays are taken.

A.    Yes.

Q.    And I want you to assume, based on that -- would
that back up your conclusion that it is probably that
this injury and the damage that this man suffered and the
flexion in his finger -- that that would probably result
-- or is a basis for your conclusion that it was probably
secondary to a delay in treatment?

. . .

A.    Yes. If he saw me at seven days, he would have a
much poorer outcome than if he saw me at one day. And --
yes. I mean, as an example, if somebody came into the
emergency room in one of the hospitals in town and they
had this type of fracture, I would see them the next day
or else I would see them that day.

(Plaintiff's Exhibit 14, at 52-53.)

Dr. St. Louis performed surgery on December 29, 1995.[8] Raines

---

[8] Dr. St. Louis' account of the surgery is summarized below, in relevant
part:

Under Bier block anesthesia, an incision was made directly based
over the proximal interphalangeal joint of her [sic] left small
finger. The extensor tendon was identified and found to have a
small tear of approximately 75%. This was then retracted laterally.
The joint capsule was incised in a vertical fashion. Neurovascular
structures were retracted medially and laterally. The fracture
fragment had multiple interarticular comminuted pieces. Each piece
was carefully held in place with retraction and a small Steinman
pin.

10

was returned to St. Clair on the same day of surgery, in stable

condition. (*See* Plaintiff's Exhibit 3.)

### 2.  Post-Surgery Facts

Raines was supposed to see Dr. St. Louis on January 2, 1996,

at 8:00 a.m.  (*See* Plaintiff's Exhibit 4.)  At trial, Raines did

not recall seeing Dr. St. Louis on this date.  On January 9th,

Raines filled out a Health Services Request Form, indicating the

following:

> Recent finger Operation, swelling won't go down, constant
> Pain, no medication At this Time "except Motrin" not
> effective, would like for Doctor To look at finger and
> decide what's needed.  Appro. "2" Weeks Ago.

(Plaintiff's Exhibit 8.)  Raines was returned to Cullman to have

the pins in his finger removed on January 22nd.  Dr. St. Louis

summarized the results of that procedure:

> The patient was told specifically what we did in surgery
> on this date and told to expect a significant fixed
> flexion deformity of the finger as he has now, with
> subsiding of some swelling but for the most part the
> swelling will stay with him for the rest of his life.
>
> He understands this and we will follow up with him at a
> later date.  Recommend just to follow up in approximately
> one week so we can do further evaluation and treatment
> with him.  <u>I want to see him again, whenever it can be
> arranged</u>.

(Plaintiff's Exhibit 4 (emphasis supplied).)  Dr. St. Louis did not

---

(Plaintiff's Exhibit 4.)

11

again examine Raines after January 22nd, however. The discharge

records for that date indicate Raines' follow-up treatment should

occur at the St. Clair infirmary, not with Dr. Raines. Also, in a

"Consultation Report," the word "Yes" is circled in response to the

question, "Follow-up be Done by Institutional Physician?".

(Defendant CMS' Exhibit 6.)

In his deposition, Dr. St. Louis disputes he circled the word

"Yes":

Q.   Are you telling us now, today, that that was circled
not by you or that you don't remember circling those?

A.   I would -- I would say that based on my office
notes, that I wouldn't have circled "no" and I would not
have circled "follow-up by institutional physician."

. . .

Q.   Well, now, Doctor, let me clarify this. And I'm not
trying to cut you off, but I don't want to retrack.
Maybe it will help.
      We're beyond taking the pins out. What would
you do when he [Raines] came to you for a follow-up
visit?

A.   Schedule him to go to a hand therapist.

Q.   That's a hand therapist and x-rays. What else?

A.   Hand therapist and x-rays and make sure his finger
is not infected.

Q.   And you don't know whether or not that happened
after he left your office on the 22nd?

A.   No.

12

Q.   Anything else that you would have done for follow-up?

A.   Hand therapy and x-rays; check to make sure he didn't have an infection; and then usually with the finger, I'd probably follow it up a week later or ten days later.

. . .

Q.   So the follow-up -- but, now, the second follow-up, a therapist could do that follow-up, could he not?

A.   Well, he would be seeing the therapist daily, and they would probably give me a report every week.  And more than likely the therapist feels more comfortable if the physician sees the patient once a week.

. . .

Q.   What you've just testified to dealing with the hand therapist, the x-rays, checking to see if there's no infection, follow-up to see if there's movement or to monitor the motion in the hand, that's the standard of care, isn't it?

A.   Yes.

Q.   And anything short of that would be below the standard of care, wouldn't it?

A.   Yes.

(Plaintiff's Exhibit 14, at 89-90, 95-96, 97.)  Raines filled out

a Health Services Request Form on January 15, 1996, because he

wanted "[t]o see Mrs. Cook on 1-16-96."  (Plaintiff's Exhibit 9.)

Mrs. Cook, a nurse at St. Clair, recorded Raines as a "no show" on

that date.  (See id.)  On February 5th, the sutures remaining from

13

Raines' procedure on January 22nd were removed at St. Clair.
Raines submitted another Health Services Request Form on February
7th: "Recent finger operation, persistence swelling, and soreness
pain. Would like the doctor to examine. Sutures was removed on 2-
5-96. Thanks." (Plaintiff's Exhibit 10.) As Raines stated at
trial, these requests were made in an effort to see Dr. St. Louis,
who had told Raines he could call on him if needed.

Raines filled out two more Health Service Request Forms, on
June 19, 1996, and again on July 14, 1996. (Plaintiff's Exhibits
11, 12.) Each form listed pain and swelling in his finger as the
predominant complaint. On both occasions, Raines communicated to
Mrs. Cook his desire to see Dr. St. Louis. (See id.) These
requests were denied, and all subsequent care for his finger was
assumed by CMS personnel at St. Clair. Raines continues to
complain of pain. He testified that arthritis had "set up" in his
finger, and the amount of pain fluctuates with changes in the
weather. He further testified he was not happy with the results of
his surgery. The finger remains locked at a forty-five degree
angle.

## II. CONCLUSIONS OF LAW

### A.    42 U.S.C. § 1983

"Section 1983 creates a cause of action against any person

14

who, acting under color of state law, abridges rights created by the Constitution and laws of the United States." Erwin Chemerinsky, *Federal Jurisdiction* § 8.1, at 422 (2d ed. 1994). This statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

## B. Introduction to Eighth Amendment Violation based on Deliberate Indifference to Serious Medical Needs

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that deliberate indifference to a prisoner's serious medical needs contravened the Eighth Amendment, providing that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment applies to the states through the Fourteenth Amendment. *See Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758

15

(1962). Specifically, the Court in *Estelle* concluded that the
"deliberate indifference to serious medical needs of prisoners
constitutes the 'unnecessary and wanton infliction of pain,'
proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104, 97
S.Ct. at 291 (quoting *Gregg v. Georgia*, 428 U.S. 153, 182-83, 96
S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

     "Deliberate indifference" must be distinguished from medical
negligence, or "malpractice." *See Estelle*, 429 U.S. at 106, 97
S.Ct. at 292 (noting that "a complaint that a physician has been
negligent in diagnosing or treating a medical condition does not
state a valid claim of medical mistreatment under the Eighth
Amendment"). "In order to state a cognizable claim, a prisoner
must allege acts or omissions sufficiently harmful to evidence
deliberate indifference to serious medical needs. It is only such
indifference that can offend 'evolving standards of decency' in
violation of the Eighth Amendment." *Id.*

     In *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128
L.Ed.2d 811 (1994), the Court elaborated on what is required to
prove deliberate indifference:

>     [A] prison official cannot be found liable under the
>     Eighth Amendment for denying an inmate humane conditions
>     of confinement unless the official <u>knows of and
>     disregards an excessive risk to inmate health or safety</u>;

16

> the official must <u>both</u> be aware of facts from which the
> inference could be drawn that a substantial risk of
> serious harm exists, <u>and</u> he must also draw the inference.
> ... An act or omission unaccompanied by knowledge of a
> significant risk of harm might well be something society
> wishes to discourage, and if harm does result society
> might well wish to assure compensation. The common law
> reflects such concerns when it imposes tort liability on
> a purely objective basis. But an official's failure to
> alleviate a significant risk that he should have
> perceived but did not, while no cause for condemnation,
> cannot under our cases be condemned as the infliction of
> punishment.

*Id.* at 837-38, 114 S.Ct. at 1979 (emphasis supplied) (citations

omitted). Under *Farmer,* therefore, a plaintiff alleging deliberate

indifference to serious medical needs must prove not only knowledge

of an excessive risk to health, but also disregard of that risk.

*See Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999).

"Proof that the defendant should have perceived the risk, but did

not, is insufficient." *Id.* (citation omitted). In its most recent

summary of the requirements of *Estelle* and *Farmer,* the Eleventh

Circuit held that "deliberate indifference has three components:

(1) subjective knowledge of a risk of serious harm; (2) disregard

of that risk; (3) by conduct that is more than mere negligence."

*McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999).

In an effort to distinguish this concept from negligence, the

Eleventh Circuit defined "certain categories of action or inaction

17

that may constitute deliberate indifference":

> We have repeatedly found that "an official acts with
> deliberate indifference when he or she knows that an
> inmate is in serious need of medical care, but he fails
> or refuses to obtain medical treatment for the inmate."
> *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425
> (11th Cir. 1997); *Mandel v. Doe*, 888 F.2d 783, 788 (11th
> Cir. 1989) .... <u>Even where medical care is ultimately
> provided, a prison official may nonetheless act with
> deliberate indifference by delaying the treatment of
> serious medical needs, even for a period of hours, though
> the reason for the delay and the nature of the medical
> need is relevant in determining what type of delay is
> constitutionally intolerable</u>. See *Harris v. Coweta
> County*, 21 F.3d 388, 393-94 (11th Cir. 1994); *Brown v.
> Hughes*, 894 F.2d 1533, 1537-39 (11th Cir. 1990). <u>We have
> also held that deliberate indifference may be established
> by a showing of grossly inadequate care as well as by a
> decision to take an easier but less efficacious course of
> treatment</u>. See *Steele v. Shah*, 87 F.3d 1266, 1269-70
> (11th Cir. 1996); *Waldrop v. Evans*, 871 F.2d 1030, 1035
> (11th Cir. 1989). Moreover, "[w]hen the need for
> treatment is so obvious, medical care which is so cursory
> as to amount to no treatment at all may amount to
> deliberate indifference." *Mandel*, 888 F.2d at 789;
> *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704
> (11th Cir. 1985).

*Id.* (emphasis added). Accordingly, this court must analyze whether

the treatment Raines received constituted deliberate indifference

to his serious medical needs. This requires examination of the

facts from the date of injury forward.

Regrettably, none of the CMS personnel who actually laid hands

upon plaintiff during the course of his contested treatment are

named as defendants. *See Pinkney v. Davis*, 952 F. Supp. 1561, 1568

18

(M.D. Ala. 1997) ("This case is in a peculiar procedural posture. The prison health care provider ... has been charged with deliberate indifference because of the acts and omissions of the physicians which it employs, but none of those defendants have been named as a defendant.").

Still, this court must assess whether their collective actions fit within any of the categories mentioned above.  *See id.* ("Nonetheless, the court believes that it is appropriate to determine whether the treatment provided the plaintiff meets the constitutional standard.").

If the court finds CMS personnel violated Raines' Eighth Amendment rights by acting with deliberate indifference, it then will assess whether any of the named defendants are liable under § 1983.

## C.  Did the Treatment Raines Received Amount to Deliberate Indifference to Serious Medical Needs?

Raines alleges CMS personnel were deliberately indifferent to his serious medical needs[9] during two separate periods. The first period begins on December 20, 1995, when Raines filled out his

---

[9] It is clear that Raines' broken finger constituted a "serious" medical need. *See Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1187-88 nn.21-22 (11th Cir. 1994) (distinguishing "serious" physical conditions from "nonserious" ones); *Brown v. Hughes,* 894 F.2d 1533, 1538 n.4 (11th Cir. 1990) (same). This point was not contested by defendants at trial.

19

first Health Services Request Form, and concludes on December 27, 1995, when Raines finally was examined by a CMS physician and x-rays of his finger were taken. He argues the one-week delay in treatment constitutes deliberate indifference. The second period runs from January 22, 1996, the date of Raines' last examination by Dr. St. Louis, to the present. He argues CMS personnel were deliberately indifferent by refusing to return him to Dr. St. Louis for follow-up care. He contends treatment by CMS personnel at St. Clair effectively constituted denial of necessary post-operative treatment. According to Raines, this contributed to the permanent loss of motion and continual pain in his finger. The court analyzes each period to see whether CMS personnel were deliberately indifferent to Raines' serious medical needs.

1.    **First period - December 20, 1995 to December 27, 1995**

Delay in providing attention to a serious medical need may constitute deliberate indifference. *See Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994) (delay of several months in treating nerve condition); *Brown v. Hughes*, 894 F.2d 1533, 1537-38 (11th Cir. 1990) (delay of several hours in treating broken foot). According to the *Harris* court:

> The tolerable length of delay in providing medical attention depends on the nature of the medical need and

20

> the reason for the delay. A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference.

*Harris*, 21 F.3d at 393-94 (emphasis supplied). To prove delay constituted deliberate indifference, plaintiff must satisfy the requirements the Supreme Court established in *Farmer*. Therefore, Raines must prove that CMS personnel had subjective knowledge of a risk of serious harm that may result based on the delay. He also must show CMS personnel disregarded this risk. Finally, he must prove the conduct of CMS' personnel amounted to "more than mere negligence." *McElligott*, 182 F.3d at 1255. Raines' evidence does not prove deliberate indifference on the part of CMS personnel during the week of December 20th.

The overwhelming majority of plaintiff's evidence[10] focuses on whether treatment of a potentially broken finger with mild medication and a splint constitutes a breach of the applicable standard of care. This is the legal framework for analysis of medical malpractice liability. This point also applies to CMS' failure to obtain x-rays before December 27th. *See Estelle*, 429 U.S. at 107, 97 S.Ct. at 293 (noting that "[a] medical decision not

---

[10] This evidence consisted primarily of the cross-examination of three witnesses (Linton and CMS' two experts, Dr. Hammack and Dr. Russell) as well as the deposition testimony of Dr. St. Louis.

21

to order an X-ray, or like measures, does not represent cruel and unusual punishment[,]" and at most amounts to medical malpractice"). Although Raines complained to CMS personnel while picking up his medication after December 21st, these requests, standing alone, do not establish the severity of his medical needs. *Cf. Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989).

Raines' initial characterization of his injury was in his Health Services Request Form of December 20th. (*See* Defendant CMS' Exhibit 8.) The general statement "fell in shower and hurt hand" does not alert a treating nurse to the severity of the injury at the time. Based on this statement and the initial observations recorded in Raines' Body Chart, this court cannot conclude that Nurse Cushin had subjective knowledge of a risk of serious harm, or that he disregarded this risk by splinting the finger, ordering mild medication, and recommending doctor evaluation. The lack of direct testimony by Cushin, or expert testimony as to the inferences that should have been made based on Raines' own description of his condition, reiterates Raines' failure to satisfy the rigorous requirements of *Farmer*.

Dr. Hammack relied on the triage decision of Cushin in formulating a plan of treatment for Raines. Cushin classified

22

Raines' condition as a "non-emergency."[11]  Still, Raines' Body Chart
indicated a possible fracture of his finger.[12]  The testimony and
cross-examination of Dr. Hammack and Dr. Russell focused on whether
waiting a week to x-ray a potentially broken finger comports with
the standard of care.  Dr. Russell indicated he would defer to the
opinion of an orthopedic surgeon, like Dr. St. Louis, that a delay
of this magnitude would result in greater and more permanent damage
to Raines' finger.  Still, this testimony provides no inference as
to Dr. Hammack's state of mind in assessing the condition of
Raines' finger, based on Cushin's report.

The Eleventh Circuit recently discussed the type of expert
testimony required to substantiate a deliberate indifference claim.
*See Campbell*, 169 F.3d at 1368-72.  The *Campbell* court noted that
a "plaintiff must submit evidence that the medical professional ...
actually was aware of the significant risk of serious harm but
deliberately proceeded with grossly inadequate treatment anyway."
*Id.* at 1370.  Conclusory statements that a treating physician was
deliberately indifferent or breached the standard of care do not
aid the plaintiff.  *See id.* at 1371 n.21.  In sum, the evidence
fails to establish deliberate indifference on the part of CMS

---

[11] *See supra* pages 4-5.

[12] *See supra* pages 7-8.

23

personnel during the period from December 20, 1995 to December 27, 1995.

### 2. Second Period - January 22, 1996 to Present

In *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985), the Eleventh Circuit noted that knowledge of the need for medical care and intentional refusal to provide that care surpasses negligence and constitutes deliberate indifference. *Id.* at 704. The *Ancata* court cited in text a statement by the Tenth Circuit in *Ramos v. Lam*, 639 F.2d 559, 575 (10th Cir. 1980):

> Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment.

*Ancata*, 769 F.2d at 704. Again, the requirements of *Farmer* apply to any allegation of deliberate indifference in this context.

Testimony offered through Dr. St. Louis' deposition indicates physical therapy would have helped restore the range of motion in Raines' finger, at least partially. According to Dr. St. Louis, failure to provide therapy as part of Raines' follow-up treatment violates the standard of care. A peripheral issue here deals with the identity of that person who ordered Raines' follow-up to occur at St. Clair. Dr. St. Louis claims he did not order institutional

24

follow-up, because he wanted to see Raines again. On the other hand, no evidence was adduced at trial relating to who else could possibly have made this determination.

Raines again fails to make out a claim for deliberate indifference under *Farmer*. He put on no evidence suggesting CMS personnel had subjective knowledge that follow-up treatment at St. Clair after January 22nd (rather than at Dr. St. Louis' office in Cullman, Alabama) posed a risk of serious harm to Raines, or that these personnel disregarded this risk in treating Raines after that date. At most, the deposition testimony of Dr. St. Louis indicates CMS personnel at St. Clair violated the standard of care by failing to provide physical therapy to Raines.

## D. Would any of the Named Defendants have been Liable for the Deliberate Indifference of CMS Medical Personnel?

Had CMS personnel been found by this court to be deliberately indifferent to Raines' serious medical needs, that finding would have begged another question: Would any of the named defendants be liable to Raines for the violation of his Eighth Amendment rights? The court summarily addresses this issue below.

### 1. CMS

Based on its contract with ADOC, CMS qualifies as a "person" acting "under color of state law." *See Pinkney*, 952 F. Supp. at

25

1569. The basis for assessing CMS' potential liability under section 1983 "is the same as that applied to municipalities under the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)." *Id.*; *see also Swan v. Daniels*, 923 F. Supp. 626 (D. Del. 1995) (analogizing ARA Health Services, a prisoner health care provider operating under CMS' name, to municipality for purposes of section 1983); *Unterburg v. Correctional Medical Services, Inc.*, 799 F. Supp. 490 (E.D. Pa. 1992) (same).

This requires proof that CMS was either directly involved in the violation of Raines' Eighth Amendment rights, or that this violation was the result of a CMS policy or custom. *See Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir. 1986). The Eleventh Circuit recently reiterated this point:

> [Raines] must also be able to demonstrate a direct causal link between a [CMS] policy or custom and the alleged constitutional deprivations. It has long been settled that respondeat superior principles of liability do not apply to municipalities [CMS, for purposes of this case] in § 1983 actions. Liability will attach only where a government custom or policy is the "'the moving force of the constitutional violation.'"

*Young v. City of Augusta*, 59 F.3d 1160, 1171 (11th Cir. 1995) (citations omitted). A policy creating section 1983 liability reflects "a conscious choice by policymakers among alternative

26

courses of action, which in turn, caused ... deliberate indifference." *Id.* at 1172 (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389-91, 109 S.Ct. 1197, 1205-06, 103 L.Ed.2d 412 (1989)).

There is no evidence that CMS, independent of its personnel, would have been directly involved in the violation of Raines' Eighth Amendment rights. The Eleventh Circuit has recognized, however, that a policy of inadequate staffing may lead to liability under section 1983. In *Anderson v. City of Atlanta,* 778 F.2d 678 (11th Cir. 1985), the court denied the city of Atlanta's motion for judgment notwithstanding the jury verdict, because the evidence was sufficient to show that the city engaged in a "pattern or practice of understaffing ...." *Id.* at 686 n.11. The court stated:

Using these standards, the above summary of the testimony and proof at trial indicates that there was certainly enough evidence to permit the jury to return a verdict against Director Hudson and the City of Atlanta that was not founded upon respondeat superior. There was sufficient evidence for the jury to find that Director Hudson, whose acts may be said to represent official policy of the City of Atlanta, knew that the Pre-trial Detention Center was inadequately staffed and that it was difficult for the officers to perform their jobs properly. Thus, it was possible for the jury to decide that it was difficult for the officers to perform their jobs properly. Thus, it was possible for the jury to decide that there was a conscious decision on the part of Director Hudson and therefore, the City of Atlanta, not to increase the staff at the Detention Center in the face

27

> of complaints of inadequate staffing. The result of this
> decision was that officers were unable to perform their
> jobs properly. Furthermore, the jury could have found
> that Director Hudson and the City of Atlanta knew or
> should have known that the natural consequence of this
> failure to adequately staff the jail would impair proper
> medical care and attention necessary to protect the
> health of pre-trial detainees.

*Id.* at 686 (under *City of Revere v. Massachusetts General Hospital,*
463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983), pre-trial
detainees are afforded the same protections under the due process
clause of the Fourteenth Amendment as inmates are afforded under
the Eighth Amendment); *see also Ancata,* 769 F.2d at 704 (deliberate
indifference may be shown by revealing a policy of inadequate
staffing, such that an inmate is effectively denied access to
adequate medical care).

Raines has failed to articulate any CMS policy or custom that
triggered a deprivation of his constitutional rights. He put on no
evidence relating to CMS' holiday staffing procedures at St. Clair.
No questions along this line were posed to Dr. Hammack, the medical
director at St. Clair. The policies and procedures submitted into
evidence dealt with "Emergency" and "Non-emergency" situations.
CMS personnel either on duty or "on call" at the time of Raines'
complaint made the decision to deem the situation as a non-emergent
one. This triage decision is referenced in CMS' "Daily Handling of

28

Non-Emergency Medical Requests."[13]   This discretionary decision,

made in accordance with existing CMS policy, cannot be deemed

"policy or custom" in itself.  *See City of St. Louis v. Praprotnik*,

485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).  In *Praprotnik*,

the Supreme court noted:

> Simply going along with discretionary decisions made by
> one's subordinates, however, is not a delegation to them
> of the authority to make policy.  <u>It is equally</u>
> <u>consistent with a presumption that the subordinates are</u>
> <u>faithfully attempting to comply with the policies that</u>
> <u>are supposed to guide them</u>.  It would be a different
> matter if a particular decision by a subordinate was cast
> in the form of a policy statement and expressly approved
> by the supervising policymaker.  It would also be a
> different matter if a series of decisions by a
> subordinate official manifested a "custom or usage" of
> which the supervisor must have been aware. ... <u>But the</u>
> <u>mere failure to investigate the basis of a subordinate's</u>
> <u>discretionary decisions does not amount to a delegation</u>
> <u>of policymaking authority ....   In such circumstances,</u>
> <u>the purposes of § 1983 would not be served by treating a</u>
> <u>subordinate employee's decision as if it were a</u>
> <u>reflection of municipal policy</u>.

*Id.* at 129-30, 108 S.Ct. at 927-28 (emphasis supplied).

Again, the overwhelming majority of evidence in this case went

to whether Raines' treatment by CMS personnel comported with the

standard of care.  It is clear CMS personnel followed established

guidelines in their treatment of Raines.  Raines' argument focused

not on whether St. Clair was properly staffed during the time in

---

[13] *See supra* pages 4-5.

29

question or whether the policies relating to emergencies and non-emergencies were sound, but whether the staff that was present made proper medical decisions. This line of analysis is not sufficient to hold CMS liable under section 1983, because it is based on *respondeat superior*. *See generally Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Given the evidence at trial, Raines' strongest claim is one based on medical malpractice against certain CMS personnel. Unfortunately, that cause of action is not before this court.

## 2. Ron Jones in his official capacity

Raines' claim against Ron Jones, in his official capacity as the former commissioner of ADOC, fails for the reasons set forth in section II.D.1 of this opinion. He has failed to prove any ADOC policy or custom caused any injury that may have resulted from the deliberate indifference of CMS personnel. Further, Raines submitted no contract or agreement between ADOC and CMS relating to limitation of liability or responsibility for final decision-making authority. *See generally Howell v. Evans*, 922 F.2d 712, 724-25 (11th Cir. 1991), *opinion vacated*, 931 F.2d 711 (11th Cir. 1991), *reversed and remanded sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994).

30

### 3.   Ron Jones in his individual capacity

Raines' claim against Jones, in his individual capacity, necessarily fails because he was not directly involved in the treatment of his injured finger. There is no evidence that Jones, individually, had (1) subjective knowledge of Raines' risk of serious harm; (2) disregarded this risk; or (3) engaged in any conduct constituting more than mere negligence. See McElligott, 182 F.3d at 1255 (defining requirements for individual liability under Estelle and Farmer).

### III. CONCLUSION

For the foregoing reasons, judgment in this action is due to be entered in favor of defendants.   Therefore, all claims of plaintiff against defendants under 42 U.S.C. § 1983 are due to be dismissed with prejudice. An order consistent with this memorandum opinion shall be filed contemporaneously herewith.

DONE this the 30th day of September, 1999.

_____

United States District Judge

31